Jeffrey T. BRYANT

v.

PLATFORM WELL SERVICE, INC.

Civ. A. No. 82–2337.

United States District Court,
E.D. Louisiana.

May 17, 1983.

Feliciano Lozes, New Orleans, La., for defendant, Platform Well Service, Inc.

ROBERT F. COLLINS, District Judge.

## REASONS

This matter arises out of an action for personal injuries filed by plaintiff, Jeffrey T. Bryant, against defendant, Platform Well Service, Inc. (hereinafter Platform). Plaintiff alleges that Platform was negligent and this negligence caused his injury. Defendant Platform filed a third party demand against Louisiana Offshore Caterers, Inc. (hereinafter LOC) alleging that LOC owes Platform indemnity pursuant to an October, 1981 contractual agreement between LOC and Platform.

Platform contends that under the terms of the October, 1981 contract, LOC owes defendant indemnity for all matters alleged by plaintiff against the defendant, Platform. In other words, defendant Platform argues that LOC is contractually obligated to indemnify defendant Platform for its own negligence. LOC contends that the contract in question is null and void and seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In support of this argument, LOC cites LSA–R.S. 9:2780, commonly referred to as the Oilfield Indemnity Act (hereinafter The Act). The Act provides for the nullification of a contract which seeks to cause the subcontractor to indemnify the major contractor for the major contractor's negligence. LOC argues that the October, 1981 contract between LOC and Platform is such a contract and is thus null and void. Accordingly, LOC seeks to have the third party complaint against it dismissed.

In opposition to LOC's motion for summary judgment, Platform contends that LSA–R.S. 9:2780 is unconstitutional. Platform bases this argument on two grounds. First, Platform argues that The Act violates the prohibition against "special laws" found in Article III § 12 of the Louisiana State Constitution. In this regard, Platform argues that the statute is unconstitutional, in that it is a special law enacted for the benefit of oilfield service contractors.

Coleman T. Organ, New Orleans, La., for third party defendant, Louisiana Offshore Caterers, Inc.

The preamble of LSA–R.S. 9:2780 reveals that The Act provides: "For the invalidity of certain indemnity agreements affecting industries engaged in the development, exploration and exploitation of sources of energy; . . ."

Defendant Platform argues that the singling out of the oil industry for special treatment insofar as an indemnity agreement is concerned is a special law and is exactly the type of legislation which Article III § 12 of the Louisiana State Constitution is designed to prevent. Secondly, defendant Platform contends that The Act violates the equal protection guarantees found in the Fourteenth Amendment of the United States Constitution and in Articles I, II, and III of the Louisiana State Constitution.

■ The Court does not agree that LSA–R.S. 9:2780 is a "special law" within the meaning of Louisiana State Constitution Article III § 12. That article reads as follows:

> 12 Prohibited Local and Special Laws Section 12(a) prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law: . . . (6) regulating labor, trade, manufacturing, or agriculture; fixing the rate of interest.

Platform's beginning premise is that " . . . the Oilfield Indemnity Act is in violation of the Louisiana Constitution in that it is a special law for the benefit of oilfield service contractors." (Platform memo, page 2) The scope of this statute goes much farther than just the oil industry. It covers " . . . water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state . . ."

In *Teachers' Retirement System of Louisiana v. Vial,* 317 So.2d 179 (La.1975), the Louisiana Supreme Court set out more fully the definition of a "special law":

> In essence, a special law is one directed to secure some private advantage or advancement for the benefit of private persons.

*Teachers, supra,* at 183. The Court there was addressing a challenge to the Louisiana State Retirement Fund for teachers. The assertion that the statute creating the fund was a special law was denied, the Court stating: "This classification is reasonable and applies uniformly to persons possessing the controlling characteristics of the class, *viz.,* employment as a teacher within the public schools of Louisiana." *Teachers, supra,* at 183.

In *Martin v. Louisiana Stadium and Exposition District,* 349 So.2d 349 (4th Cir. 1977), the Fourth Circuit Court of Appeals addressed a challenge that statutes regulating bidding for work at the Louisiana Superdome were "special laws." These contracts were let without use of Louisiana's Public Bid Law. Once this was discovered, the Louisiana Legislature passed a statute to validate the otherwise invalid contracts. The Court there said with respect to the definition of a "special law:"

> The article is intended to prevent abuse of legislative power on behalf of special interests and to prohibit the exemption of an individual or private corporation from the operation of a general law.

*Martin, supra,* at 359. LSA–R.S. 9:2780 is clearly applicable to a vastly greater number than "an individual or private corporation." It applies to the water, coal, gas, oil and any other mineral industry. It applies to oil companies and subcontractors. Accordingly, the Court finds that LSA–R.S. 9:2780 is not a "special law."

Defendant Platform also contends that LSA–R.S. 9:2780 is violative of the equal protection guarantees found in both the United States Constitution and the Louisiana State Constitution. The fundamental rule of both constitutions is that all persons should be equally treated by the law. Platform asserts that LSA–R.S. 9:2780 violates this rule by singling out oil companies and limiting their ability to require subcontractors to indemnify them for their own fault or negligence. The Court does not agree that LSA–R.S. 9:2780 violates either state or federal constitutional guarantees. As indicated previously, this statute affects a much broader group than just oil companies or even the oil industry as a whole.

■ The central question is whether the classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion or alienage. If it does, the Court must strictly scrutinize the statute. *New Orleans v. Duke,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1975) at 517. Under "strict scrutiny," the legislation must bear a necessary relationship to a compelling state interest.

■ If, however, the classification does not affect a fundamental right or create a suspect classification, it is constitutional if it bears a rational relationship to a legitimate state purpose. *ACORN v. City of New Orleans,* 377 So.2d 1206, 1214 (La. 1980). In the present case, since the classification is not based on race, religion or any other fundamental right, it does not bring "strict scrutiny" into play. Additionally, the jurisprudence holds that in economic areas, states are accorded wide latitude in the regulation of their local economies, and rational distinctions made with less than mathematical exactitude are permitted. See *New Orleans, supra,* at 517. In *ACORN, supra,* the Louisiana Supreme Court dealt with a special ordinance passed to tax property owners just in Orleans Parish. The Court refused to apply strict scrutiny and in the process of holding the ordinance constitutional, reiterated several important guidelines a court must consider in applying the "rational relation" test.

■ Citing *Louisiana & Arkansas Ry. Co. v. Goslin,* 258 La. 530, 246 So.2d 852 (La. 1971) the Court said: "... it is the burden of those attacking the classification to show that there is no conceivable legitimate state purpose" *ACORN, supra,* at 1215. Further, it must be *presumed* that the statute is constitutional and the legislature created the classification in good faith, and that any exclusions made therefrom were for valid reasons.

With respect to the *reasons* behind the statute's enactment, the Court said:

> In such cases as this one, where it is asserted that certain classifications or exemptions therefrom are discriminatory and violative of the principles of equal protection, the function of the courts is to determine whether the distinction is arbitrary or is based on practical and reasonable grounds with relation to the public purpose sought to be achieved by the legislation.

*ACORN, supra,* at 1215.

The mineral industry is one of the most important industries in this state. Additionally, it is well known that the exploration for oil and gas is an extremely hazardous undertaking. It is the size of the minerals industry and the vast number who work in it which motivated the legislature to move to limit indemnity agreements.

LSA–R.S. 9:2780 on its face prevents one company (indemnitee) from requiring another company (indemnitor) to indemnify it for its own negligence or fault. If the indemnitee can by contract insulate itself from exposure for injuries to workers, where it creates the hazard causing the injury, there is less motivation to follow the safest work practices. If the indemnitee is prevented from contracting away the responsibility, then it will be more likely to take the extra needed steps to avoid injury to workers. This statute, is a rational way to protect Louisiana workers and the oil industry in general from less than optimum safety measures.

The United States Court of Appeals for the Ninth Circuit has considered the same constitutional challenges raised here, as against a similar statute. In *Reding v. Texaco,* 598 F.2d 513 (9th Cir.1979), the Court considered equal protection arguments regarding a Wyoming statute of the same type as LSA–R.S. 9:2780, which also voids indemnity agreements. The entire text of that statute is set out herein:

30–1–131. PROVISIONS FOR INDEMNITY IN CERTAIN CONTRACTS; INVALIDITY.

(a) All agreements, covenants or promises contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water, or mine for any mineral, which purport to indemnify the

indemnitee against loss or liability for damages for:

    (i) death or bodily injury to persons;

    (ii) injury to property; or

    (iii) any other loss, damage, or expense under either (i) or (ii) from:

    (A) the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or

    (B) from any accident which occurs in operations carried on at the direction or under the supervision of the indemnitee or an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee,

are against public policy and are void and unenforceable to the extent that such contract of indemnity by its terms purports to relieve the indemnitee from loss or liability for its own negligence. This provision shall not affect the validity of any insurance contract or any benefit conferred by the Worker's Compensation Law [27–12–101 to 27–12–805] of this state. (Laws 1969, ch. 46,1; 1977, ch. 145,1)

Section 30–1–131 (previously 30–28.3) was originally challenged before the Wyoming Supreme Court in *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351 (Wyo.1978). The Court applied the "rational relation" test and found that the statute did not violate equal protection guarantees. In addressing the challenger's argument that the statute must apply to all industries in the state, the Court said:

> We must reject Mountain Fuel's claim to the effect that for the statute to be held valid, it must be applicable to all contracts that contain the prohibited indemnity agreements. We find that there is a reasonable basis for the classification, particularly when we consider that in meeting the different requirement, *the legislature is not required to nullify indemnity agreements in every area where their use might be considered contrary to the public interest.*

*Emerson, supra,* at 1355 (emphasis supplied). In confirming that Wyoming's statute was a rational response to a legitimate state interest, the Court pointed out that the mineral industry in Wyoming is the "single most dominant ecomonic factor in the state." *Id.* at 1355. There, as in Louisiana, Wyoming officials had an important interest in making an admittedly hazardous industry safer.

The Court in *Reding v. Texaco,* 598 F.2d 513 (9th Cir.1979), citing *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351 (Wyo. 1978) agreed that Wyoming's statute met the equal protection standards and referred the parties to the *Emerson, supra,* decision for rationale and authority. *Reding, supra,* at 520.

    The Court agrees with the rationale of the *Reding, supra* court. Accordingly, the Court finds that the challenge to LSA–R.S. 9:2780 on equal protection grounds must fail. LSA–R.S. 9:2780 is rationally related to a very important state interest, i.e., the safety of state workers in one of the state's largest industries. Additionally, the act is not a special statute for a group of private individuals.

In accordance with this finding, third party defendant's motion for summary judgment is GRANTED.