**Roger MOSER**

v.

**AMINOIL, U.S.A., INC., et al.**

**Civ. A. No. 83–0284.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Aug. 22, 1985.

Lucius A. Hornsby, Jr., Hornsby & Landry, Lafayette, La., for plaintiff, Moser.

David A. Hurlburt, Hurlburt & Privat, Lafayette, La., for Aminoil, U.S.A., Inc.

James E. Williams, Earl G. Pitre, Woodley, Barnett, Williams, Fenet & Palmer, Lake Charles, La., for Sweco, Inc., Liberty Mut. Ins. Co.

## RULING

VERON, District Judge.

This matter comes before the Court on (1) the motion of defendant Sweco, Inc. for summary judgment in its favor dismissing the demands against it by plaintiff Roger Moser, (2) the motion of defendant Aminoil, U.S.A., Inc. for summary judgment in its favor dismissing the demands against it by Moser, and (3) the motion of Sweco, as cross-defendant, and third-party defendant Liberty Mutual Insurance Company for summary judgment in their favor dismissing the cross-claim of Aminoil for contractual indemnity and its third-party demand for recognition as an additional insured under Sweco's policy with Liberty Mutual. At the conclusion of oral argument on these motions the Court granted Sweco's and Aminoil's motions for summary judgment on Moser's claims and took the motions by Sweco and Liberty Mutual under advisement. As this order did not adjudicate all of the claims as to all parties in this action, it did not terminate the action as to any party and is subject to revision at this time. Fed.Rule Civ.Pro. 54(b). The review of the motion under advisement has required a review and reexamination of the other motions filed and, accordingly, the Court now VACATES those prior rulings on a *sua sponte* motion for reconsideration. The Court will now rule anew on a clean slate.

Moser's complaint alleges that he was injured on February 9, 1982 while being transported in a personnel basket from a fixed platform located fifty miles off the Louisiana coast, the East Cameron 195, Well No. A7, to a vessel, the Glomar Tender No. 2. Moser seeks relief from Sweco under the Jones Act. He seeks relief from Aminoil on the alternative theories (1) that Aminoil was responsible for the alleged negligence of the vessel under Aminoil's control as charterer, owner and operator, and, (2) that Aminoil was responsible as platform owner for alleged negligence in the operation of the platform. Moser also seeks relief from Global Marine Drilling Company in its alleged capacity as owner of the vessel. Aminoil has cross-claimed against Sweco for contractual indemnity and has third-partied Liberty Mutual for recognition as an additional insured in a Sweco policy with Liberty Mutual.

## I. ISSUES

The various motions before the Court raise the following issues:

(1) Whether the plaintiff is a member of the crew of the Glomar Tender No. 2;

(2) Whether Aminoil is entitled to tort immunity under section 5(a) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a), as to the plaintiff's claims; and

(3) If Aminoil is not entitled to such immunity, whether Aminoil's contractual indemnity claim is barred by the Louisiana Oilfield Anti-Indemnity Act, La.R.S. 9:2780.

The Court will now consider each of these issues in turn.

## II. SEAMAN'S STATUS

Sweco urges that Moser's Jones Act claim must be dismissed because he does not qualify as a seaman. Moser contends that, had he continued working in 1982, he would have been permanently assigned to the Glomar Tender No. 2. The uncontroverted deposition testimony does not bear out Moser's contention and instead confirms Sweco's argument that Moser was not a seaman at the time of his injury.

The record establishes the following facts for the purposes of this motion. Sweco rents and sells solids control equip-

ment for use in the oil industry. Solids control equipment separates certain solids from drilling fluid for reuse. At the time of his injury, Moser had been employed for six or seven months as a service representative for Sweco. A service representative is responsible for the installation, upkeep and repair of equipment rented by Sweco. In the course of this employment, Moser would go out on calls to inland and offshore rigs to either install equipment or to trouble-shoot problems with previously-rented equipment. He worked indiscriminately on land-based rigs, fixed offshore platforms, and special purpose drilling vessels, depending upon the needs of Sweco's various customers. If he installed a particular piece of equipment, he would service that item on an as-called basis unless and until the rig was moved out of Moser's territory. Yet Moser would stay at the job site only long enough to complete the job in question, subject to the usual delays occasioned by weather, transportation, and other operations on the rig in question.

In February 1982, Moser was sent out to the East Cameron 195 Well No. A7 platform to install a mud cleaner and an electric pump skid. This platform was a fixed platform situated on the Outer Continental Shelf approximately fifty miles off the coast of Louisiana. The drilling crew ate and slept aboard a tender anchored adjacent to the platform, the Glomar Tender No. 2. When Moser and his assistant arrived, they had to wait eight to ten hours on the tender while the rig was being "skidded over" on the platform—an operation whereby the rig is moved from one well site on the platform to another well site on the same platform. After this wait, Moser and his assistant went onto the rig and installed the Sweco equipment. Upon completion of the job, Moser proceeded to return to the tender by way of a steep stairway that was hinged to the platform and which was lowered toward the deck of the tender. Moser allegedly was injured during this descent. Shortly thereafter, a helicopter arrived as scheduled to transport Moser and his assistant back shoreside.

■ Nothing in the record in any way intimates that the Glomar Tender No. 2 was to be Moser's base of operations for his offshore work with Sweco. The Glomar Tender No. 2 was not a special purpose vessel used by Sweco in order to transport and serve as a base of operations for its service representatives. Rather, the vessel was used by Sweco's customer, Aminoil, to quarter the drilling crew for the fixed platform. The vessel was anchored securely by that platform. Under these circumstances, it would not have made any difference if Moser had lived continuously on the tender while performing his servicing duties on the platform. Eating and sleeping aboard a tender associated with a fixed platform does not confer seaman's status on workers engaged in platform-related activities on the platform. *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 731 (5th Cir.1972); *see also Munguia v. Chevron Company, U.S.A.*, 768 F.2d 649 (5th Cir.1985) (a roving "jack of all trades" roustabout who used various small vessels as transportation to and from his work on various fixed platforms did not qualify as a seaman because his primary duties involved platform work); *Poole v. Marlin Drilling Co.*, 592 F.Supp. 60 (W.D.La.1984) (a roughneck on a fixed platform did not become a seaman while eating and sleeping on an associated vessel during the dismantling and transportation of the rig to another platform). Thus, the Court holds that Moser does not qualify as a seaman.

### III. TORT IMMUNITY

■ In seeking to have Moser's claim against it dismissed, Aminoil contends that it is entitled to tort immunity under section 4(a) of the LHWCA because Sweco has secured the payment of compensation benefits for its employees, including Moser. Aminoil relies on *Washington Metropolitan Area Transit Authority v. Johnson*, 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984), and *Doucet v. Atlantic Richfield Co.*, No. 83–0351, (W.D.La., July 27, 1984), the latter of which directly supports its position and which is reprinted as an

appendix in *Aucoin v. Pelham Marine, Inc.*, 593 F.Supp. 770, 777–78 (W.D.La. 1984). At the time that Aminoil filed its motion, the decisions in *Washington Metropolitan* and *Doucet* constituted the only law on the subject. Congress has subsequently amended the LHWCA to the effect that the securing of compensation benefits by the subcontractor does not entitle the contractor to immunity from tort claims by the subcontractors employees. *See generally* Maraist, *Developments in the Law, 1983–84—Admiralty*, 45 La.L.Rev. 179, 191–92 & n. 82 (1984). The Fifth Circuit has held that this amendment applies retroactively to all claims, such as this one, that were pending as of the enactment of the amendment. *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 958 (5th Cir.1984); *Martin v. Ingalls Shipbuilding, Division of Litton Systems, Inc.*, 746 F.2d 231, 232 (5th Cir.1984). A panel of the court accordingly has reversed the district court's decision in *Doucet. Doucet v. Atlantic Richfield Co.*, 753 F.2d 1074 (5th Cir.1985). The Fifth Circuit has also held that the retroactive application of this amendment is constitutional. *Louviere v. Marathon Oil Co.*, 755 F.2d 428, 430 (5th Cir.1985). Thus, Aminoil has no claim to immunity under the Longshoremen's Act from Moser's tort suit.

## IV. LOUISIANA OILFIELD ANTI–INDEMNITY ACT

Sweco and Liberty Mutual contend that Aminoil's claims pursuant to the indemnity and insurance provisions in a master service agreement between Sweco and Aminoil are barred by the Louisiana Oilfield Anti-Indemnity Act, La.R.S. 9:2780. Section 2780 renders indemnity agreements in oilfield contracts void to the extent that they provide for defense and indemnification based on the indemnitee's sole or concurrent fault. Aminoil urges in response (1) that the Act is inconsistent with federal law and therefore inapplicable on the Outer Continental Shelf under 43 U.S.C. § 1333(a)(2)(A), (2) that the Act cannot be retroactively applied to this master service agreement, which was entered into prior to

its effective date, and (3) that, if applicable, the Act does not mandate complete dismissal of its cross-claim and third-party demands.

The indemnity provision in question here provides:

> [Sweco] shall hold harmless, defend and indemnify [Aminoil] from and against all losses, damages, demands, claims, suits, and other liabilities, including counsel fees and other expenses of litigation, arising out of or related to services performed by [Sweco], its agents, or employees, or subcontractors; unless such liabilities or losses result from the sole negligence or willful misconduct of [Aminoil], its agents, or employees.

The parties have not briefed the question of whether this provision encompasses claims based upon the concurrent negligence of Aminoil. The Court will assume, but expressly does not decide, that the provision does encompass such a claim.

### *Application on the Outer Continental Shelf*

In its first argument, Aminoil contends that section 2780 does not apply on the Shelf because the Act is inconsistent with the common law rule enunciated in *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). *Seckinger* holds that, under the federal common law governing contracts entered into by the United States, an indemnitee is permitted to recover for claims arising out of its own negligence. 397 U.S. at 209–217, 90 S.Ct. at 884–88. The Court rejects this argument for the reasons it has assigned in this regard in *Hebert v. Kerr-McGee Corporation*, 618 F.Supp. 767, 768–769 (W.D. La.1985).

### *Constitutional Challenges*

Aminoil next urges that the Act cannot be applied to its agreement with Sweco because to do so would violate the prohibitions against *ex post facto* laws and laws impairing the obligations of contracts

under the United States and Louisiana constitutions.[1] Aminoil and Sweco entered into the master service agreement on July 6, 1978, which date is some three years before the Act's effective date, September 11, 1981. Yet Aminoil issued the work order for the specific job involved here in February of 1982. It is well-established that the Act applies to indemnity claims under master service agreements executed prior to the effective date of the Act where both the issuance of the specific work order and the alleged injury occur after September 11, 1981. *See Rigby v. Tenneco Oil Co.,* 607 F.Supp. 1247, 1248 (E.D.La.1985); *Durant v. Chevron U.S.A., Inc.,* 594 F.Supp. 527, 535–36 (E.D.La.1984); *Aucoin v. Pelham Marine Inc.,* 593 F.Supp. 770, 775–76 (W.D.La.1984); *Home Insurance Co. v. Garber Industries, Inc.,* 588 F.Supp. 1218, 1221–22 & n. 16 (W.D.La.1984); *Livings v. Service Truck Lines of Tex., Inc.,* 467 So.2d 595 (La.App. 3d Cir.1985). Aminoil does not challenge this construction of the Act, but contends that this manner of applying the statute violates the aforementioned constitutional guarantees.

The prohibitions against *ex post facto* laws under the constitutions of Louisiana and the United States of course apply only to criminal and not to non-penal civil statutes. *E.g., Harisiades v. Shaughnessy,* 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952); *United States v. Tex-La Electric Cooperative, Inc.,* 693 F.2d 392, 404 n. 15 (5th Cir.1982); *Cooper v. Lykes,* 218 La. 251, 49 So.2d 3, 4 (1950). The only constitutional question remaining before the Court in this regard therefore is whether section 2780 violates state and federal constitutional prohibitions against the impairment of the obligations of contracts.

■■■ A statute cannot unconstitutionally impair an obligation that did not exist at

the time of its enactment. *E.g., Texaco, Inc. v. Short,* 454 U.S. 516, 531, 102 S.Ct. 781, 793, 70 L.Ed.2d 738 (1982). In the instant case, no contractual obligations arose from the 1978 master service agreement. The agreement does not bind either party to perform any services. It merely sets forth their agreement to abide by certain terms should they enter into contractual relations in the future. At best, the master service agreement creates a contingent and speculative obligation that is subject to a purely potestative suspensive condition on the part of the obligee, which obligation does not become valid and enforceable until the condition is fulfilled. *See Durant,* 594 F.Supp. at 531, 533. In short, no valid obligation arises until the platform operator, Aminoil, requests the services of the subcontractor, Sweco, and, at that point, the terms of the master service agreement are incorporated automatically into the written or verbal contract to perform the specified services. *See also Credeur v. Union Oil Company,* No. 82–0275, (W.D.La., June 27, 1983) (reprinted as an appendix to this ruling). Thus, when section 2780 is applied to an indemnity obligation arising out of a work order issued after September 11, 1981, the statute does not operate retroactively to impair any contractual obligation existing as of its effective date. *Accord Reding v. Texaco, Inc.,* 598 F.2d 513, 519–20 (9th Cir.1979) (application of the 1969 Wyoming anti-indemnity act to a 1973 drilling bid contract incorporating the terms of a blanket standard drilling contract did not impair a contract existing at the time of the statute's enactment); *see also Lirette v. Union Texas Petroleum Corporation,* 467 So.2d 29, 33 (La.App. 1st Cir.1985) (the statute does not in fact provide for retroactive effect).[2]

---

**1.** *See* U.S. Const. art. I, § 10, cl. 1; La. Const. art. I, § 23 (1974).

**2.** The Contracts Clause apparently prohibits the impairment of executory contracts. *See Home Building & Loan Ass'n. v. Blaisdell,* 290 U.S. 398, 429 n. 8, 54 S.Ct. 231, 236 n. 8, 78 L.Ed. 413 (1934); *Farrington v. Tennessee,* 95 U.S. (5 Otto) 679, 24 L.Ed. 558, 559 (1878). A master service

agreement is not an executory contract, however. An executory contract is an agreement to do something in the future. *E.g., Farrington, supra.* A master service agreement, on the other hand, is an agreement to abide by certain terms *if* the parties agree to do something in the future. As such, "modification" of the master service agreement by subsequent legislation does not violate the Contracts Clause because

Moreover, even if application of section 2780 in this manner does impair a contractual obligation existing at the time of its enactment, the impairment does not violate constitutional prohibitions against the impairment of contracts. State regulations may permissibly create even substantial impairments of existing contractual obligations if (1) the state has a significant and legitimate public purpose behind the regulation, and, (2) the impairment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the statute's adoption. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 705, 74 L.Ed.2d 569 (1983). Where the impairment is of private contracts, courts properly defer to the legislative judgment as to the necessity and reasonableness of a particular measure. *Energy Reserves Group, Inc.*, 103 S.Ct. at 706. Section 2780 is prompted by significant and legitimate public interests in that it seeks "to protect Louisiana workers and the oil industry in general from less than optimum safety measures." *Bryant v. Platform Well Service, Inc.*, 563 F.Supp. 760, 763 (E.D.La.1983). Moreover, any consequent impairment of indemnity obligations in oilfield contracts by section 2780 is based upon reasonable conditions and is appropriately related to this public purpose. The observations made by Judge Collins in rejecting an equal protection challenge to the Act are equally applicable on these points:

> The mineral industry is one of the most important industries in this state. Additionally, it is well known that the exploration for oil and gas is an extremely hazardous undertaking. It is the size of the minerals industry and the vast number who work in it which motivated the legislature to move to limit indemnity agreements.

the obligation of a contract within the meaning of that clause "is a valid, subsisting obligation, not a contingent or speculative one." *Ochiltree v. Iowa Railroad Contracting Company*, 88 U.S. (21 Wall.) 249, 252, 22 L.Ed. 546, 548 (1875).

LSA–R.S. 9:2780 on its face prevents one company (indemnitee) from requiring another company (indemnitor) to indemnify it for its own negligence or fault. If the indemnitee can by contract insulate itself from exposure for injuries to workers, where it creates the hazard causing the injury, there is less motivation to follow the safest work practices. If the indemnitee is prevented from contracting away the responsibility, then it will be more likely to take the extra needed steps to avoid injury to workers. This statute, is a rational way to protect Louisiana workers and the oil industry in general from less than optimum safety measures.

*Bryant*, 563 F.Supp. at 763. That the public interest in oilfield safety is sufficiently broad to support any consequent impairment of indemnity provisions set forth in master service agreements can not be seriously doubted. Not only is the safety of workers engaged in the industry implicated, but the threat to person and property in the general public from unsafe oilfield operations is involved as well. Application of the Act to work orders issued after its effective date directly furthers the goal of the Act by encouraging oilfield safety in the future.

Thus, for the foregoing reasons, the Court holds that application of the Louisiana Oilfield Anti-Indemnity Act to a work order issued after its effective date that incorporates terms of indemnity found in a master service agreement drafted prior to the statute's effective date does not violate Louisiana or federal constitutional guarantees against legislation impairing the obligations of contracts. The work order pertinent to this case was issued after the effective date of section 2780. The Act therefore applies to the contractual indemnity claim presented here.

Put simply, parties cannot avoid future changes in the law by entering into blanket agreements specifying the terms of all contracts that they might enter into in the future.

*Effect of Section 2780*

Lastly, Aminoil urges that, if section 2780 is applicable here, that the Act does not mandate complete dismissal of its cross-claim, relying on the decision in *Home Insurance Company v. Garber Industries, Inc.*, 588 F.Supp. 1218 (W.D.La. 1984). In *Garber*, the district court held that section 2780 did not prohibit payment of the costs of defense if the indemnitee is ultimately found free from fault by the trier of fact. 588 F.Supp. at 1222–23. The court relied upon the statutory language in subsection (B) of the Act which provides that an oilfield agreement "is void and unenforceable *to the extent* that it purports to or does provide" for defense and indemnity against the sole or concurrent negligence of the indemnitee or other interests delineated in the statute. *See* 588 F.Supp. at 1223. Yet, at the time that it rendered its decision, the district court in *Garber* did not have the benefit of the Fifth Circuit's opinion in *Sullen v. Missouri Pacific Railroad Company*, 750 F.2d 428 (5th Cir. 1985), which clarifies its earlier expressions regarding the prerequisites for defense and indemnity under Louisiana law.

 Under *Sullen's* construction of Louisiana law, the matter of whether a party is obliged to tender a defense to another party depends entirely upon the allegations in the plaintiff's precipitating pleadings. 750 F.2d at 433. The ultimate outcome of the case before the trier of fact has no impact on the duty to defend. *Id.* Thus, the indemnitor must defend the indemnitee only if (1) the contract specifically provides for the costs of defense as a separate item of indemnification, and (2) the petition alleges facts which, if proven,

would be properly covered by the indemnity agreement. 750 F.2d at 433–34. In the instant case, Moser's complaint is based on the alleged concurrent negligence of Aminoil, Sweco and Global Marine. Section 2780 will not permit Sweco to defend or indemnify Aminoil for its concurrent negligence. Thus, as the plaintiff's precipitating pleadings do not allege facts which, if proven, would be properly covered by the indemnity agreement, the claim for contractual indemnity must fall *in toto*. *See also Frazier v. Columbia Gas Development Corp.*, 605 F.Supp. 200 (W.D.La. 1985), *on reconsideration of the ruling in Frazier v. Columbia Gas Development Corp.*, 596 F.Supp. 429 (W.D.La.1984) (on rehearing, the *Frazier* court departed from *Garber* and applied *Sullen* to dismiss the entire claim for defense and indemnity).[3]

A question does remain of what the Louisiana legislature intends by the use of the phrase "to the extent" in section 2780. Perhaps the legislature intended for the phrase to validate agreements to indemnify an indemnitee for no-fault species of vicarious liability. That question, however, must await another day.

Accordingly, the motion of Sweco, Inc. for summary judgment in its favor dismissing the demands against it by plaintiff Roger Moser is GRANTED, the motion of defendant Aminoil, U.S.A., Inc. for summary judgment in its favor dismissing the demands against it by plaintiff Moser is DENIED, and the motion of cross-defendant Sweco, Inc. and third-party defendant Liberty Mutual Insurance Company for summary judgment in their favor dismissing the cross-claim and third-party demand

---

3. *Garber* was followed on this particular point by the Louisiana Third Circuit Court of Appeal in *Livings v. Service Truck Lines of Texas, Inc.*, 467 So.2d 595, 599–600 (La.App. 3d Cir.1985). While the Court is bound to apply section 2780 in this Lands Act case as surrogate federal law on the Shelf, the Court does not consider itself any more bound by the decisions of intermediate appellate state courts than it would in a diversity case. Under *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the decision of lower state courts are not controlling where the state's highest court has not spoken on the point. The federal courts must follow these decisions, however, absent a strong showing that the state's highest court would hold otherwise. *E.g., Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *NCH Corporation v. Broyles*, 749 F.2d 247, 250 n. 4 (5th Cir.1985). The decision in *Sullen* provides just such a strong showing that the Louisiana Supreme Court would not follow the holding in *Livings* on this point.

made against them by Aminoil, U.S.A., Inc. is GRANTED.

### APPENDIX

### UNITED STATES DISTRICT COURT

### WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE–OPELOUSAS DIVISION

ARTHUR CREDEUR

VS.

UNION OIL COMPANY OF CALIFORNIA ET AL

CIVIL ACTION NO. 820275

### RULING ON MOTION

This is an action to recover for personal injuries sustained by Credeur, an employee of SHRM Catering Services, Ltd., while working aboard a fixed platform. The platform, Vermilion 67–B, is owned by Union and was located in Vermilion Block 76 off the Louisiana coast. SHRM was providing catering services to Union. A blanket service agreement had been execured by the parties on January 13, 1981. Credeur was injured on or about October 20, 1981.

Suit was brought against Union pursuant to 43 U.S.C.A. § 1331, et seq. Union in turn filed a third party demand against SHRM for contractual indemnity as provided by the written agreement between the two. SHRM has now moved for summary judgment.

SHRM argues that Union's third party demand for contractual indemnity is barred by LSA–RS 9:2780 (the act), which renders certain indemnity agreements null as against public policy. The act became effective on September 11, 1981, prior to the date of plaintiff's injury but subsequent to the execution of the continuing SHRM–Union agreement.

The contract between the parties is a blanket agreement whereby SHRM agrees "from time to time and upon receipt from Union of instructions specifying the specific service to be performed and/or materials to be supplied, [to] furnish equipment and personnel to perform services normally provided by contractor when requested by Union...." (Union contract, ¶ 1) It is expressly understood between the parties that no performance is required by SHRM until Union gives specific instructions to that effect. The blanket contract only serves to establish the terms and conditions of performance pursuant to those instructions.

Under the blanket contract, a separate, independent contract was perfected on each occasion that SHRM provided equipment and personnel on instructions of Union.

The affidavit of Charles Wilson, personnel manager for SHRM, establishes that the services and equipment on the job in question were ordered by Union after September 11, 1981, the effective date of the accident. I conclude therefore that the act nullifies the indemnity obligation which SHRM assumed under the blanket contract for performance of the job in question. The motion of SHRM is therefore granted.

Lafayette, Louisiana, this 16th day of June, 1983.

/s/ W. Eugene Davis
Judge, United States
District Court