Robert Lee **BURNHAM**

v.

**SUN OIL COMPANY.**

Civ. A. No. 83–0175.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Aug. 23, 1985.

Wilson M. Montero and Joseph E. Roberts, Metairie, La., William Henry Sanders, Jena, La., Terry L. Jordan, Philadelphia, Miss., for plaintiff, Burnham.

Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles, La., for Sun Oil Co.

Susan A. Daigle & Edwin G. Preis, Jr., Preis, Kraft, LaBorde & Daigle, Lafayette, La., for Cactus Int'l., Inc.

Randy J. Fuerst, Camp, Carmouche, Barsh, Hunter, Gray & Hoffman, Lake Charles, La., for Nat'l Union Fire Ins. Co. of Pittsburg, Pa.

## RULING

VERON, District Judge.

This matter comes before the Court on the motion or petition of third-party plaintiff Sun Oil Company for a declaratory judgment declaring its rights pertaining to its third-party claim for contractual defense and indemnity from Cactus International, Inc. The plaintiff in this suit, Robert Lee Burnham, alleges that he was injured on March 11, 1982 while employed by Cactus on a fixed offshore platform owned by Sun when he fell down an allegedly defective flight of stairs. Sun has in turn third-partied Cactus alleging that Burnham's claim is encompassed by an indemnity provision contained in a platform drilling contract entered into by Sun and Cactus. Neither party disputes that the platform on which the accident allegedly occurred, a Sun platform in Block 648 of the West Cameron Area, is located on the Outer Continental Shelf some 120 miles off the Louisiana coast.

Several of the provisions of the platform drilling contract between Sun and Cactus, which is dated October 20, 1980, are pertinent to the issues raised in this motion. Paragraph 1.1 of Article I of the contract provides that "[Cactus] agrees to drill and complete according to the terms hereof, one or more wells in search of oil and/or gas on a Federal Lease in United States waters of The Gulf of Mexico, Offshore Louisiana, Offshore Texas, at a location on which Company will construct an eight pile, multiple slot, minimum self-contained type platform." Paragraph 1.2 provides further that the drilling rig "Cactus 101" would be

installed on the platform to drill the well or wells contemplated by the contract. Paragraph 2.1 of Article 2 provides that the contract will become effective from its date of execution, and "shall continue in effect until all Platform slots have been drilled," subject to limited contract termination and contract extension rights in Sun and subject to immediate termination should the Cactus 101 rig become an actual or constructive total loss. Article 14 contains reciprocal indemnity provisions, which basically provide that each party will be responsible for the claims of their employees or the employees of their respective subcontractors. Paragraph 14.3 contains the indemnity provision that is relevant to this case, which provides in pertinent part:

> [Cactus] agrees to indemnify and hold harmless [Sun] ... against any and all claims, demands or suits (including, but not limited to, claims, demands, or suits for bodily injury ...) which may be brought against [Sun] or in which [Sun] is named a party defendant ... by any employee of [Cactus] in any wise arising out of or incident to the work performed under this Contract, irrespective of whether such suits are based on the relationship of master and servant, third party or otherwise and even though occasioned, brought about, or caused in whole or in part by the negligence of [Sun] ... [and] [Cactus] further agrees to investigate, handle, respond to, provide defense for and defend any such claim, demand or suit at its sole expense and agrees to bear all other costs and expenses related thereto, even if it is groundless, false or fraudulent ....

Finally, Paragraph 19.2 of Article 19 provides that "[a]ll questions arising out of this Contract or its validity, interpretation, performance or breach shall be governed by the law of the State of Texas, not including, however, any conflicts-of-law rule of the State of Texas which may direct or refer any such determination to the laws of any other jurisdiction."

In its principal argument opposing the motion, Cactus contends that the Louisiana Oilfield Anti-Indemnity Act, La.R.S. 9:2780, invalidates the indemnity provision set forth in Paragraph 14.3, and that, accordingly, the provision opting for Texas law should not be enforced because to do so would violate Louisiana public policy.[1] *Cf. NCH Corporation v. Broyles*, 749 F.2d 247 (5th Cir.1985) (the provision for application of North Carolina law was not enforced because to do so would violate the strong public policy in Louisiana that disfavors covenants not to compete). Yet the contract in question was executed on October 20, 1980, which date is nearly one year prior to the effective date of the Act, September 11, 1981. If the Act does not retroactively invalidate the indemnity provision in the contract, then it follows that application of Texas law here would not violate Louisiana public policy. *See Lirette v. Union Texas Petroleum Corporation*, 467 So.2d 29, 32–33 (La.App. 1st Cir.1985) (the Texas choice-of-law provision was enforceable because section 2780 would not apply retroactively to invalidate the indemnity provision). Thus, the Court must determine whether section 2780 applies retroactively on the facts presented in this case.

Cactus characterizes the contract in this case as a "master service agreement" and urges that the Act therefore should apply because the injury is alleged to have occurred after the effective date of the Act. Paragraph (I) of section 2780 provides:

> This Act shall apply to certain provisions contained in, collateral to or affecting agreements in connection with the activities listed in Subsection C which are designed to provide indemnity to the indemnitee for all work performed between the indemnitor and the indemnitee in the future. This specifically includes what is

---

1. Cactus also contends that Paragraph 14.3 does not clearly and unambiguously require Cactus to defend and indemnify Sun for claims brought by Cactus employees. Yet the language excerpted in the text could hardly be clearer on this point. The express terms of the contract, if enforceable, bind Cactus to defend and indemnify Sun against claims brought by Cactus employees.

commonly referred to in the oil industry as master or general service agreements or blanket contracts in whatever form and by whatever name. The provisions of this Act shall not apply to a contract providing indemnity to the indemnitee when such contract was executed before the effective date of this Act and which contract governs a specific terminable performance of a specific job or activity listed in Subsection C.

This provision distinguishes "master service agreements" from contracts which govern a "specific terminable performance." As Judge Shaw observed in *Home Insurance Company v. Garber Industries, Inc.*, 588 F.Supp. 1218 (W.D.La.1984), the clear inference from the statutory distinction between the two types of contracts is that, while the Act cannot apply to a contract executed prior to its effective date that governs a specific terminable performance, the Act can apply in certain instances to a master service contract executed prior to the effective date of section 2780. 588 F.Supp. at 1222. It is well-established that the Act applies to indemnity claims under master service agreements executed prior to the effective date of the Act where both the issuance of the specific work order and the alleged injury occur after September 11, 1981. *E.g., Moser v. Aminoil, U.S.A., Inc.*, 618 F.Supp. 774, 778–79 (W.D. La.1985) (collects citations to prior cases on point). Cactus relies upon this principle in its claim that the Act applies on the facts of this case.

■ The Court concludes, however, that this platform drilling contract is a contract that "governs a specific terminable performance of a specific job or activity" rather than a "master service contract." Unlike a master service agreement, this con-

tract does not purport to adopt blanket terms for any and all work that the parties might perform in the future. Instead, the contract is directed to a specific job or activity—the drilling of one or more wells with Cactus Rig 101 on the platform designated by Sun, that being the platform in Block 648 of the West Cameron Area, in search of oil and/or gas on an offshore federal mineral lease held by Sun. And, unlike the standard master service agreement, this drilling contract does not extend indefinitely until one of the parties gives notice of its intent to terminate the agreement. Rather, the drilling contract will terminate on its own terms at the completion of the specific job—when "all Platform slots have been drilled"—or upon the impossibility of further performance on the job occasioned by the loss of Cactus Rig 101. The inclusion of standard terms that grant Sun the option, within ninety days of the completion of the primary drilling period, of extending the contract for another platform drilling project does not render the contract anything other than a contract for a "specific terminable performance." Whether in the original or an extended term, the contract is nonetheless subject to automatic termination at the completion of the specific job unless Sun exercises its option to extend the contract for another specific job.[2]

Moreover, the contract presented here lacks the attributes that have been relied upon in earlier cases that apply section 2780 to pre-Act master service agreements. A master service agreement contemplates as yet unspecified and wholly contingent performance in the future. The agreement standing alone obligates neither party to perform any services. The issuance of a specific work order triggers the obligation

---

**2.** Cactus has not come forward with any evidence raising a factual issue as to whether Sun in fact exercised the option to extend the contract from an earlier platform drilling job to the Block 648 job. Nor has Cactus urged that such a factual issue might be material on the ground that exercise of the option to extend actually constituted a renewal of the contract and thereby created a new contract that came into existence after September 11, 1981. *Cf. Long v. Diamond M Drilling Co., Inc.*, 674 F.2d 425, 427 (5th Cir.1982) (the court observed that, even if the extension of the original contract gave rise to a new contract under Texas law, article 2212b nonetheless applied because the last act necessary for the formation of the supposed new contract occurred prior to the effective date of the Act).

to perform. Thus, when the Act is applied to work orders issued after September 11, 1981, it is in fact being applied only prospectively because it is being applied to a separate and independent contract that came into existence after its effective date. *Moser,* at 779–80; *see also Hebert v. Kerr-McGee Corporation,* 618 F.Supp. 767, 772–73 (W.D.La.1985) (related analysis in choice-of-law context). This platform drilling contract, on the other hand, immediately, and independently of any other agreement, binds both Sun and Cactus to perform certain specified obligations in furtherance of the particular offshore drilling project.

The foregoing discussion demonstrates that it would be more consonant with the statutory language and the prior jurisprudence to classify this platform drilling contract as a "specific terminable performance" contract rather than as a "master service" contract. Section 2780 therefore does not apply to this contract because it was executed prior to the statute's effective date. La.R.S. 9:2780 (I). As the Act would not bar the indemnity claim if Louisiana law were to apply, enforcement of the contractual choice of Texas law would not violate Louisiana public policy here. *Cf. Lirette,* 467 So.2d at 32–33 (the Louisiana public policy embodied in section 2780 was not violated by enforcing a Texas choice-of-law provision in a specific terminable performance contract executed prior to September 11, 1981). Thus, Texas law governs here.

■ Texas statutory law also bars provisions in oilfield contracts purporting to indemnify an indemnitee against the consequences of its own negligence. Tex.Civ. Stat.Ann. art. 2212b § (2). Sun relies upon the exception contained in section 4(c) of article 2212b, which provides:

The provisions of Section 2 of this Act shall not apply to any agreement providing for indemnity with respect to claims for personal injury or death to indemnitor's employees or agents, or the employees or agents of indemnitor's sub-contractors if the parties agree in writing that such indemnity obligation will be supported by available liability insurance coverage to be furnished by indemnitor, provided, however, that such indemnity obligation shall be only to the extent of the coverages and dollar limits of insurance agreed to be furnished; but in no event shall said insurance be required in an amount in excess of twelve times state basic limits for bodily injury, approved by the Board of Insurance Commissioners in accordance with Article 5.15 of the Texas Insurance Code.

The parties do not dispute that the upper limit for permissible insurance coverage under section 4(c) is presently $300,000.00. Here, Burnham is in fact alleged to be an employee of Cactus, the indemnitor. The section 4(c) exception is therefore applicable because this claim falls within the scope of "claims for personal injury ... to indemnitor's employees." Thus, article 2212b permits Sun to enforce the indemnity clause relied upon in this case to the extent that the parties have agreed in writing that Cactus will support the indemnity obligation with liability insurance, subject to the $300,000.00 maximum upper limit.

Paragraph 14.1 of Article 14 of the drilling contract states that "[i]t is ... the intent and purpose of this Agreement to provide for indemnities to the maximum extent provided by law, and to support those indemnities by available liability insurance coverage furnished by the indemnitor." In Exhibit "E" of the agreement, Cactus specifically agrees to maintain comprehensive general liability insurance with liability limits of not less than $1,000,000.00 for any one occurrence of bodily injury. Thus, Sun can enforce the indemnity obligation undertaken by Cactus in paragraph 14.3 of the contract because Cactus has agreed to support that obligation with liability insurance. Sun's right to enforce the indemnity obligation is subject only to the present statutory maximum upper limit of $300,000.00.

Accordingly, the motion of Sun Oil Company for a declaratory judgment declaring

its rights pertaining to its third-party claim for contractual defense and indemnity from Cactus International, Inc. is GRANTED such that Cactus International, Inc. must defend and indemnify Sun Oil Company against the claim of Robert Lee Burnham up to a maximum upper limit of $300,000. Counsel for Sun shall provide the Court with an appropriate form of judgment within ten days of his receipt of this ruling.