The plaintiffs appeal from a summary judgment in favor of the defendant, Anadrill, Inc. (previously known as Anadrill Schlumberger).
The issues in this case concern indemnity provisions in two separate agreements between Anadrill and Mobil Oil Corporation ("MOC"), Mobil Oil Exploration and Producing Southeast, Inc. ("MOEPSI"), and Mobil Exploration and Producing Services United States, Inc. ("MEPSUS"). The three Mobil entities will collectively be referred to as "Mobil." Mobil's claim for indemnity arose from a personal injury that *Page 1343 
occurred at Mobil's dock in Theodore, Alabama.
Mobil ordered from Anadrill a drilling jar, to be used in offshore oil drilling. Acme Trucking Company was to deliver the drilling jar to the Mobil dock. The facts are in dispute as to whether Anadrill or Mobil contacted Acme to have it deliver the drilling jar. On January 16, 1989, Joseph Leboeuf, was delivering the drilling jar to the Mobil dock for Acme. Michael Patton, an employee of Riedel Environmental Services, Inc. ("Riedel"), was unloading the drilling jar from the Acme delivery truck when the drilling jar fell on Leboeuf. Leboeuf lost both of his legs and one of his arms as a result of the accident.
Leboeuf sued Mobil, Riedel, and Patton, alleging that negligence on their part had caused his injuries. Mobil cross-claimed against Riedel, based on an indemnity provision contained in a master service agreement between Reidel's predecessor in interest, Peterson Maritime Services, Inc., and MOEPSI.
Mobil filed a third-party complaint against Anadrill Schlumberger, later known as Anadrill, Inc. Mobil's third-party complaint was based on indemnity provisions in two separate agreements with Anadrill. In the complaint, Mobil requested indemnity for any sum paid to Leboeuf, plus interest, attorney fees, court costs, and other costs and expenses incurred by Mobil.
The first agreement was a master service agreement between Anadrill's predecessor, The Analysts, Inc., and MOC dated September 23, 1971 (hereinafter referred to as the "1971 agreement"). The 1971 agreement was adopted and ratified in April 1988 by a letter agreement between Anadrill and MEPSUS, as agent for MOEPSI. The second agreement was a master pricing agreement, subject to the terms and conditions of the "Anadrill Drilling Equipment Rentals Price Schedule," between Anadrill and MOEPSI dated August 19, 1987 (hereinafter referred to as the "1987 agreement"). The 1987 agreement included the prices for renting equipment, and that agreement was updated December 20, 1988.
The trial court severed Mobil's contractual indemnity claims against Riedel and Anadrill from Leboeuf's tort claims. Leboeuf entered into a pro tanto settlement with Mobil and was paid $2,500,000 pursuant to that settlement.
Following the settlement with Leboeuf, Mobil's indemnity claim against Riedel proceeded to trial. At trial, Mobil was awarded $2,752,045.15, based on the indemnity provisions in the master service agreement with Riedel. The award included the principal amount paid to Leboeuf, attorney fees, court costs, and other expenses.
The trial court granted Anadrill's motion for a summary judgment, which had been filed in response to Mobil's third-party complaint against Anadrill. Mobil claims that the gross amount owed by Anadrill is $2,803,953.39 and says that Anadrill will be credited with the gross payment made by Riedel, minus post-judgment interest. Mobil appeals from the summary judgment in favor of Anadrill.
The 1971 agreement between Anadrill and MOC provides in pertinent part as follows:
 "This Agreement made the 23rd day of September, 1971, by and between The Analysts, Inc., . . . hereinafter called 'Contractor' and Mobil Oil Corporation, hereinafter called 'Company', covers and includes all work or service performed and to be performed by Contractor, under verbal or written orders therefor given by Company to Contractor, at any time from the date of this agreement, except transportation service, the terms and rates of which are fixed by governmental agencies.
". . . .
 "4. Contractor shall protect, indemnify and save Company harmless against any and all such claims, demands and causes of action of every kind and character arising in favor of any person, including both Company's and Contractor's employees, on account of personal injuries or death, or damage to property occurring, growing out of, incident to, or *Page 1344 
resulting directly or indirectly from, the work to be performed by Contractor hereunder, whether such loss, damage, injury or liability arises from or is contributed to by the negligence of Company or its employees, and whether due to imperfection of any material furnished by Company, or the premises themselves or any equipment thereon, whether latent or patent, or for any other cause whatsoever; and for damages for infringement of any patent growing out of or incident to Contractor's performance of said work or the use of material or equipment furnished by Contractor.
". . . .
 "All the agreements between the parties have been reduced to writing herein. No one other than the representative executing this instrument on behalf of Company, or his superior, shall have any authority to modify, change or waive any part hereof, and then only in writing signed by such representative, his superior, or the person designated by either of them in writing."
The 1987 agreement between Anadrill and MEPSUS provides in pertinent part as follows:
 "Mobil Exploration and Producing Services Inc. (hereinafter 'MEPSI') and Contractor in consideration of the terms and conditions contained herein agree that the prices and price-related terms set out herein shall apply to all work, services, and materials provided by Contractor pursuant to the applicable contracts between Contractor and Mobil Affiliates. Terms and conditions . . . 2. Each Mobil Affiliate contract shall govern with respect to all matters not specifically addressed in this MPA [master pricing agreement]. In case of conflict this MPA shall govern. . . ."
The 1987 agreement included the prices for renting drilling equipment and included discounts applicable to certain equipment. Also, the Anadrill equipment rental price schedule included the following rental terms and conditions:
 "Anadrill, Inc., . . . as an independent contractor, offers services requested by Customer under the following General Terms and Conditions.
"1. Acceptance of General Terms and Conditions
 "Anadrill's prices reflect the fact that Customer assumes, releases, and indemnifies Anadrill from certain liabilities and responsibilities as provided herein. By requesting Anadrill, whether verbally or in writing, to furnish Johnston and/or other drilling and/or fishing tools ('Equipment') on a rental basis, Customer voluntarily elects to enter into and be bound by these General Terms and Conditions: this provision shall apply even in the event that delivery has been made prior to the signature of a formal agreement.
"2. Delivery
 "a) Anadrill will have the Equipment delivered at Customer's expense:
"(i) to the onshore wellsite; or
 "(ii) to the port designated by Customer, for offshore locations. . . .
". . . .
"5. Liabilities and Indemnities
 "a) Anadrill agrees to be liable for and shall indemnify and hold Customer and its directors, officers and employees harmless from and against all claims, costs (including attorney's fees) and expenses arising out of the illness or death of or injury to any of Anadrill's personnel or its contractors, subcontractors, invitees or agents.
 "This indemnity and assumption of liability shall apply regardless of the cause and even in the event of the sole, gross or concurrent negligence of Customer.
 "b) Customer agrees to be liable for and shall indemnify and hold Anadrill and its directors, officers and employees harmless from and against all claims, costs (including attorney's fees) and expenses arising out of the illness or death of or injury to any of Customer's personnel or the personnel of its contractors (other than Anadrill), subcontractors, personnel, invitees or agents and/or loss of or damage to any of Customer's property and equipment or that of its contractors, *Page 1345 
subcontractors, personnel, invitees or agents.
 "This indemnity and assumption of liability shall apply regardless of the cause and even in the event of the sole, gross, or concurrent negligence of Anadrill.
". . . .
"11. Governing Law
 "This contract shall be governed by and construed in accordance with the laws of the State in which the Equipment is furnished: however, where any equipment is furnished offshore or in navigable waters, the Federal maritime laws shall govern."
We must first discuss the nature of the two agreements involved in this case. The 1971 agreement is a master service agreement. A master service agreement is not binding alone. A master service agreement provides the framework for subsequent contracts that result from oral or written work orders.Matte v. Zapata Offshore Co., 784 F.2d 628 (5th Cir. 1986), cert. denied sub nom. Zapata Offshore Co. v. Timco, Inc.,479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986). This type of contract is common in offshore oil production. "Such a contract 'merely sets out the rules of the game in the event the parties decide to play ball.' " Thurmond v. Delta Well Surveyors,836 F.2d 952, 953 (5th Cir. 1988), citing Page v. Gulf Oil Corp.,775 F.2d 1311, 1315 (5th Cir. 1985).
"A master service agreement contemplates as yet unspecified and wholly contingent performance in the future. The agreement standing alone obligates neither party to perform any services. The issuance of a specific work order triggers the obligation to perform." Burnham v. Sun Oil Co., 618 F. Supp. 782, 785
(W.D.La. 1985). The terms of the master service agreement are then automatically incorporated into the written or verbal contract to perform the specified services. Therefore, the 1971 agreement did not come into existence until after the offer and acceptance of the individual work order requesting the drilling jar.
In order to be enforceable, a contract to enter into a future contract must be definite and certain in all of its terms and conditions so that the court can know what the parties have agreed upon. Muscle Shoals Aviation, Inc. v. Muscle ShoalsAirport Authority, 508 So.2d 225 (Ala. 1987). Because there was specificity as to the terms and conditions to apply under the 1971 agreement, we hold that the 1971 agreement became valid and enforceable when Mobil ordered the drilling jar from Anadrill and Anadrill accepted the order.
The 1987 agreement was a master pricing agreement. Unlike the 1971 agreement, the 1987 agreement included the specific terms needed to constitute an offer by Anadrill. The 1987 agreement provided the list price, the applicable discount, transportation terms, delivery conditions, warranties, payment terms, and confidentiality provisions; an indemnity clause; aforce majeure term; an extension of terms to manufacturers and suppliers; a merger clause; and a governing law provision. The offer was accepted when Mobil ordered the drilling jar; the acceptance made the 1987 agreement enforceable.
Although both agreements were valid and enforceable when the accident occurred, the 1987 agreement specifically states that "in case of conflict, this [agreement] shall govern." The conflict arises in the indemnity clauses in the two agreements.
The 1971 agreement provides for indemnity for claimsif the claim grows out of, occurs, is incident to, or results directly or indirectly from the work to be performed by Anadrill. The 1987 agreement provides that Anadrill will indemnify Mobil for claims for injury to any of Anadrill's personnel or to the personnel of its contractors, subcontractors, invitees, or agents, regardless of the cause of the injury. Clearly, the 1987 agreement provides that Anadrill shall indemnify Mobil regardless of whether the claim was incident to or resulted from the work to be performed by Anadrill. Because the indemnity clauses are conflicting, the 1987 agreement governs. The general rule of contract law is that if a written contract exists, the rights *Page 1346 
of the parties are controlled by that contract and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms, in the absence of mistake, fraud, or ambiguity. Clark v. Albertville Nursing Home, Inc., 545 So.2d 9
(Ala. 1989).
 " 'The Court has, for many years, held that as between private parties, indemnity contracts are enforceable if the contract clearly indicates an intention to indemnify against the consequences of the indemnitee's negligence, and such provision was clearly understood by the indemnitor, and there is not shown to be evidence of a disproportionate bargaining position in favor of the indemnitee.' "
Black Diamond Coal Min. Co. v. USX Corp., 581 So.2d 839 (Ala. 1991), quoting Industrial Tile, Inc. v. Stewart, 388 So.2d 171,175 (Ala. 1980), cert. denied, 449 U.S. 1081, 101 S.Ct. 864,66 L.Ed.2d 805 (1981) (other citations omitted).
Anadrill argues that Alabama's public policy does not allow Mobil to obtain indemnity from an innocent party (Anadrill) who had no control over the activity giving rise to the claim. However, Anadrill drafted the 1987 agreement, including the indemnity clause. It would be unfair to nullify the indemnity clause, given that Anadrill wrote the very clause that it now claims is void because of public policy.
 "If the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language, then such agreements will be upheld."
Industrial Tile, Inc. v. Stewart, 388 So.2d at 176.
We now turn to our discussion of the indemnity clause in the 1987 agreement, because that agreement is controlling. The 1987 agreement provides for indemnity if an employee of Anadrill or an employee of a subcontractor or contractor of Anadrill is injured. The evidence is in dispute as to whether Acme was a contractor of Mobil or of Anadrill. This question of fact must be answered by a jury. If the jury determines that Acme was a contractor of Anadrill, then Anadrill must indemnify Mobil for the injuries to Leboeuf. If the jury determines that Acme was a contractor of Mobil, then Mobil is not entitled to indemnity from Anadrill.
A summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), A.R.Civ.P. Once the moving party has made a prima facie showing that there is no genuine issue of material fact, the non-moving party must rebut that prima facie showing by presenting "substantial evidence" in support of the nonmovant's position, thereby showing the existence of a genuine issue of material fact. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989), Ala. Code 1975, § 12-21-12. The evidence is to be viewed in a light most favorable to the nonmoving party. Streeter v. Young,583 So.2d 1339 (Ala. 1991).
In a breach of contract action, a summary judgment is appropriate only where the contract is unambiguous and the facts are undisputed. Gordon v. Nelson, 555 So.2d 125 (Ala. 1989).
Based on the foregoing, the summary judgment is reversed and the cause is remanded for a trial on the merits.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and HOUSTON, JJ., concur. *Page 1347