Winston BENOIT

v.

**TRANSCO EXPLORATION COMPANY, et al.**

Civ. A. No. 82–0718.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Nov. 15, 1983.

J.B. Jones, Jr., Cameron, La., for plaintiff.

D. Mark Bienvenu, Alan K. Breaud, Lafayette, La., Frederick L. Cappel, Lake Charles, La., for defendants.

### MEMORANDUM RULING ON PENDING MOTIONS

EDWIN F. HUNTER, Jr., Senior District Judge.

Winston Benoit instituted this suit in the 38th Judicial District Court of the State of Louisiana. Plaintiff's claim is based on Louisiana law and specifically on principles enunciated in Louisiana Civil Code Article 2317. He was injured on March 18, 1980 when he slipped and fell from a Transco crane. Defendants were Transco Exploration, Reco Crane, and Link Belt. The state district judge granted summary judgment in favor of Link Belt. Reco settled pursuant to a "Mary Carter" agreement, a copy of which is attached.[1] The case was then removed to this court.

---

1. Reco paid $150,000 to Benoit, in return for which they were to receive 50% of the net amount that plaintiff might recover from Transco until such time as Reco recovered the entire $150,000. In effect, Reco was a plaintiff to the tune of up to $150,000. By consent of counsel, all of this was fully explained to the jury.

The case was submitted to the jury pursuant to special interrogatories. In response, the jury found:

(1) That plaintiff's accident was proximately caused by a vice or defect in a crane in the custody of defendant Transco.

(2) That plaintiff himself was not negligent.

(3) That plaintiff was not the borrowed employee of Transco.

(4) That Reco Crane was not negligent.

(5) That plaintiff was damaged as a result of the accident in the amount of $350,000.

Defendant, attacking the first four findings, has moved for judgment in its favor, notwithstanding the verdict of the jury, or in the alternative for a new trial.

### THE JUDGMENT N.O.V.

Our relevant inquiry as to judgment n.o.v., according to *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969, *en banc*), is whether any credible evidence exists for the verdict. We have no difficulty with Findings (1), (2) and (4).

Persuasive evidence was presented that plaintiff's accident was proximately caused by a vice or defect in the crane; that plaintiff himself was not negligent; and that Reco Crane was not negligent. True, the jury could have reached different conclusions, but they did not. The motion for judgment n.o.v. as to those findings cannot be disturbed, and no useful purpose is to be served by a recitation of that evidence. The same evidence precludes, as well, any conclusion by this Court that a new trial should be granted on those issues.

The motion as it relates to the "borrowed servant-statutory employee" defense presents a difficult problem. What statute is applicable? Defendant argues that Benoit was its "borrowed employee" and thus his exclusive remedy is for compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. 901–950. Defendant relies in the alternative on the exclusive remedy provisions of the Louisiana Workmen's Compensation Act, which applies both in the case of a "statutory" employer relationship and also an employer-employee (borrowed servant) relationship. See *Travelers v. Paramount Drilling*, 395 So.2d 849 (La.App.1981). There, after a thorough discussion of the Louisiana jurisprudence, including the Louisiana Supreme Court decision of *Maryland Casualty Company v. Liberty Mutual Insurance Company*, 254 La. 489, 224 So.2d 465 (1969), the Court held:

"Where a borrowed or special employee of the principal is a general employee of one with whom the principal has contracted, compensation liability of the principal might be based either on the employer-employee relationship or on the 'statutory' employer-employee relationship provided by Section 1061. Our view is, however, that the provisions of Section 1061 are not to be applied, as between the employers, where an employer-employee relationship exists between both employers and the employee independent of the section. The more direct relationship and basis of liability should control insofar as sharing of responsibility between the employers is concerned. "The central and determinative issue in this case is, therefore, whether the welder was a special or borrowed employee of Paramount. The trial court correctly found that he was.

\* \* \* \* \* \*

"As pointed out earlier, an employee may be both a statutory employee and a borrowed or special employee. In either case, the employee is entitled to compensation from the principal or borrowing employer, as the employee's exclusive remedy, and it matters not which theory is applied insofar as the employee is concerned."

The test for each of these immunities is different, but both render the statutory employer or borrowing employer immune from tort liability.

There is a degree of confusion as to whether we should apply Louisiana law or decisions under the Longshoremen's and

Harbor Workers Act regarding the defenses of statutory and/or borrowed employer. The relevant inquiry in determining whether an employee is engaged in maritime employment is whether his activities have "a realistically significant relationship to traditional maritime employment." Here, Benoit was employed as a roustabout to perform work on the premises of Transco, on the left descending bank of the Calcasieu River. His labors had a realistically significant relationship to maritime matters. Given the guidance of Fifth Circuit precedents, it is obvious that the Longshoremen's and Harbor Workers Act, on its own terms, applies to Benoit. In fact, compensation payments were made to him pursuant to that Act. *Herb Welding v. Gray*, 711 F.2d 666 (5th Cir., 1983). But, inquiry does not end there. The Supreme Court of the United States, within the last month, has denied certiorari in the case of *Thompson v. Teledyne Movible Offshore*, 419 So.2d 822 (La.1982). There, the Supreme Court of Louisiana held that federal and state compensation schemes may co-exist on land and in the territorial waters of Louisiana.[1] It follows that Benoit would have been entitled to Louisiana Workmen's Compensation benefits, notwithstanding his entitlement to and receipt of benefits under the Longshoremen's and Harbor Workers Act.

The instant case is a Louisiana action, and if Transco was the statutory employer of Benoit and/or if Benoit was Transco's "borrowed servant," Transco would have a workmen's compensation obligation and would be entitled to a concomitant liability shield. This requires an inquiry and an examination and application of the statutory-employer sections of the Louisiana Workmen's Compensation Act, LSA–R.S. 23:1061, and the exclusive remedy provisions of LSA–R.S. 23:1032.

The statutory language vital to our initial inquiry is found in the phrase "part of his trade, business or occupation." This language has been subjected to conflicting interpretations. The Fifth Circuit also, in *Chavers v. Exxon*, 716 F.2d 315 (5th Cir. 1983), sought to minimize these conflicts. Our appellate court has certified to the Louisiana Supreme Court several questions concerning the statutory employee defense. That court, however, declined to answer the questions. In the absence of a controlling precedent of the Louisiana Supreme Court, *Chavers* has now established the test that we must utilize in divining whether a statutory employment relationship exists.[2] We attach and make a part hereof that opinion. We did not have the advantage of the *Chavers* decision when we heard this case in July of 1983. If we had it to do over again, we would put the following additional interrogatory to the jury:

> Did Transco customarily utilize its own employees to do the work that was being performed by Winston Benoit?

If the jury's answer had been in the affirmative, Transco would have had its liability shield. If the answer had been in the negative, we would have instructed the jury to answer an additional question:

> Do other employers, engaged in businesses similar to that of Transco, customarily use their own employees to do the work that was being performed by Winston Benoit?

Before discussing the evidence as it relates to the "statutory employer" defense, it is appropriate to recite the Louisiana law as it relates to the "borrowed servant" defense. The most recent statement is found in *Marzula v. White*, 431 So.2d 858 (La.App.2d Cir.1983), where the court was called upon to decide whether the plaintiff was the borrowed employee of the defendant. The court reiterated the basic principles of Louisiana law:

> "Whether a person is a borrowed servant is an issue of fact ...

---

1. Of course, in the case of recovery under both compensation schemes, one would be credited against the other to avoid double recovery.

2. A further comment on *Chavers* is appropriate. No "borrowed employee" defense was raised due to the fact that the work was admittedly being performed by an independent contractor.

There is a presumption that the general employer retains control of his employees ...

The party who alleges that an employee has become a borrowed servant bears the burden of proof on that issue and *a mere showing of a division of control is not enough to meet that burden* ...

In order for the employee of the general employer to become the borrowed employee of a special employer it must be shown that the employer-employee relationship between the general employer and his employee has been suspended and a new and like relationship has been created between the general employer's employee and the special employer. This change of relationship does *not* occur when the work being performed by the general employer's employee is the general employer's work and where he retains *some* control over his employee ..." 431 So.2d at 861, citations omitted, emphasis added.

We have expressed our thought that this case should be governed by the Louisiana law relative "borrowed servant," but there are platform cases where the Fifth Circuit has used the Longshoremen's and Harbor Workers Act context. In that context, if Benoit was the employer of Transco, he would be covered by the Act, and the Longshoremen's and Harbor Workers Act would be his exclusive remedy. *Hebron v. Union Oil*, 634 F.2d 245 (5th Cir.1981); *Gaudet v. Exxon*, 562 F.2d 351 (5th Cir.1977). In *Gaudet*, the court, citing *Standard Oil v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), defined the borrowed servant doctrine as follows:

"One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation ... It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became pro hac vice the servants of him to whom they are furnished ... (In this case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen)....

We must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the (servant) in the performance of (his) work." (Id., at 220–221, 29 S.Ct. at 253–54, 53 L.Ed. at 483.)

As an aid in determining whether the borrowed servant relationship exists, the court enumerated the nine factors listed in *Ruiz v. Shell Oil Co.*, 413 F.2d 310, at 312–13 (5th Cir.1969). They were listed as follows:

1. Who has control over the employee and the work he is performing, *beyond* mere suggestion of details or cooperation?

2. Whose work is being performed?

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

8. Who had the right to discharge the employee?

9. Who had the obligation to pay the employee?

As to how these factors are to be applied, the court stated that "(a)pparently they are to be weighed as appropriate in each partic-

ular case," noting that none should be considered decisive (at p. 356.).

The court went on to state, as we have noted, that the policy considerations involved in use of the doctrine to impose respondeat superior liability are far different than those involved when the doctrine is used to invoke tort immunity.

"Although the coverage of the LHWCA is not contractual and does not depend on the consent of the parties, nonetheless when an employee begins work for an employer under the coverage of the LHWCA, he is presumed to have consented to the Act's trade-off of possible large common law damages for smaller but certain LHWCA benefits ..." (at 356–357).

■ There is little evidence in the record which would suffice for a finding that either employees of Transco or employees of other employers engaged in similar operations customarily performed the work being performed by Benoit. This precludes the disturbing of the verdict pegged on any argument that Transco was a statutory employer for the purpose of the exclusive remedy provision of Louisiana Compensation law. LSA–R.S. 23:1032, 23:1061; see *Chavers,* supra.

■ Our remaining inquiry must focus on the issue of "borrowed servant." We have expressed our opinion that in this diversity tort action the inquiry must be made in the context of Louisiana law, but we are persuaded that the tests under Louisiana law and in the context of the Longshoremen's and Harbor Workers Act are essentially the same. See *Gaudet v. Exxon,* 562 F.2d 351 (5th Cir.1977); *Ruiz v. Shell Oil Co.,* 413 F.2d 310 (5th Cir.1969), and *Bertrand v. Howard Trucking,* 427 So.2d 40 (La.App.1983).

## THE FACTS

We relate only those facts which concern defendant's contention that Benoit's recovery from Transco should be limited to compensation benefits. We do not believe that there is any real conflict in the evidence.

Here are the undisputed facts as we read them:

(1) Winston Benoit was hired by Crain Brothers 13 months before the accident.

(2) He was hired specifically to work at Transco's dock facility, and worked at no other place during this entire 13 months' period.

(3) Benoit was a roustabout, primarily loading and unloading supplies to be transported to offshore rigs, which were owned and operated by Transco.

(4) Benoit received a weekly check from Crain.

(5) Crain also provided him with transportation to and from the job and with various hand tools (Tr. 52–55).

(6) He reported directly to Transco's dock facility each morning and took his orders from his brother, Herbert Benoit.

(7) Herbert Benoit, the foreman, was also employed by Crain Brothers, and had been on Crain's payroll on the Transco job for two years before the accident.

(8) Transco had no supervisors or foremen over the plaintiff or at the immediate location of the work.

(9) Herbert Benoit was directed as to what work should be done by a Transco supervisor. These supervisors operated out of a Transco office located in the vicinity of the job site. He, Herbert Benoit, had no contact with Crain except receiving his weekly check through the mails.

(10) The relationship between Transco and Mr. Herbert Benoit was explained by Mr. Hay of Transco:

Q To start their day's work. How did they know what to do? Who would tell them what to do for that day?

A Well, we had—First of all we would get together, Transco would, and decide what we have got coming up. Looking at what the various rigs and platforms might need that day. And we would set our priorities and we would designate what they were going

to do. When I say we, I would pass it on to one of the other supervisors. Or I, myself, would direct their foreman to, say, off load a vessel or stack pipe or whatever. Clean, or whatever we wanted to do.

Q Now, let's say you told them to off load a vessel. Let's say that they started at 7:00 o'clock in the morning. And at 10:00 o'clock they were through. Who would tell them the next thing they had to do?

A Usually I would. If they didn't, if I wasn't out there in the yard, or another supervisor with the instructions for the next job, then Herbert or the foreman would come to the office and ask what was next on the agenda.

(11) The pedestal crane which was being used to load and unload vessels was the property of Transco. Transco also owned the spring and spreader bar being utilized. The cherry picker and truck tools which were being used belonged to Crain.

(12) Besides the Benoit brothers, two other roughnecks enjoyed the identical employment status as the Benoits—they were hired and paid by Crain.

(13) Transco employed two roustabouts of their own who performed similar work.

(14) The contract between Transco and Crain, pursuant to which Crain furnished the roustabouts, appears as Exhibit 12 and contains this provision:

"The detailed manner and method of performing the work is under the control of contractor [Crain], Company [Transco] having an interest only in the results obtained, and contractor [Crain] is an independent contractor as to all work performed hereunder."

(15) *The contract notwithstanding:* Crain had not exercised any control over either their foreman, Herbert Benoit, and/or the plaintiff, Winston Benoit, as to the details.

(16) If Transco was dissatisfied with any of the roustabouts Crain had furnished, Transco could discharge them;

Transco had, in fact, discharged people and then informed Crain that particular individuals had been discharged. Transco also had the right to override how the work was being done in the event of a conflict between Herbert Benoit, the foreman, and a Transco supervisor.

It is incumbent on me to consider all the evidence as it was presented to the jury, and to apply the standard the Fifth Circuit articulated in *Boeing,* 411 F.2d 365, 374 (1969, *en banc*).

Upon completion of this exercise, I am persuaded that there was evidence to support the jury's verdict on Question No. 3 (borrowed servant). In reaching this conclusion we note: (a) plaintiff was paid by Crain; (b) he was under the supervision of a foreman, who was also paid by Crain; (c) Crain furnished transportation to the job site; and (d) the contract between Crain and Transco left "the detailed manner and method of performing the work" to Crain.

The motion for a judgment n.o.v. and/or a new trial is DENIED.