Sam J. **CORMIER**

v.

**GULF OIL CORPORATION, et al.**

Civ. A. No. 85–525.

United States District Court,
E.D. Louisiana.

Feb. 9, 1987.

Jon A. Gegenheimer, and Michael R. Holmes, Gretna, La., for plaintiff.

John O. Charrier, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., Scott R. Wheaton, Jr., Lugenbuhl, Wheaton, Peck & Rankin, New Orleans, La., for defendant.

Gerald J. Arceneaux, Westwego, La., for intervenor.

## MEMORANDUM OPINION

MENTZ, District Judge.

Plaintiff, Sam J. Cormier, sued Gulf Oil Corporation (Gulf) to recover damages for injuries he sustained when he fell on a fueling dock at Gulf's Leeville, Louisiana Shorebase (Shorebase) on September 28, 1984. Gulf filed a third-party claim against Danos & Curole Marine Contractors, Inc. (D & C) alleging that Gulf is entitled to indemnity from D & C. Gulf filed third-party complaints against U.S. Fire Insurance Company, North River Insurance Company and International Surplus Lines Insurance Company as liability insurors of D & C and Gulf. Gulf also filed a third-party complaint against Charles O'Quin d/b/a CAT Welding Service.[1] D & C filed an intervention to assert its claim for reimbursement of benefits paid to Cormier under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950.

The case was tried to the Court which found, at the conclusion of trial, that Cormier was not the borrowed servant of Gulf, that Gulf was negligent, that Cormier was forty percent at fault, and that Cormier was capable of returning to work at $4.50 an hour. The Court now submits its reasons in support of its ruling.

The Court first addresses the borrowed servant issue. D & C, an oilfield labor contractor, hired Cormier in 1979 at the D & C personnel office. D & C assigned him to work at Gulf's Shorebase as a roustabout. During the entire time of Cormier's employment with D & C, he worked at the Shorebase, which served as a location for the staging and support of Gulf's coastal and offshore operations. By the time of his accident on September 28, 1984, Cormier had worked his way up to the position of fuel dispatcher. He was part of a dispatching crew comprising: Merlin Leonard, supervisor; Rory Griffin, material pick-up man and assistant supervisor; and two roustabouts, all of whom were D & C employees.

Every morning, Cormier was picked up at his home and driven to work in a D & C van driven by a D & C employee; every night, Cormier was taken home in the van. D & C provided this service to make sure their employees got to work on time and regularly. Gulf never provided the D & C employees transportation to and from work. When he arrived at work, Cormier reported to the D & C offices at the Shorebase. Although the D & C dispatching crew and Gulf employees worked together in the same building at the Shorebase, D & C's office where it performed clerical work and bookkeeping was separate from Gulf's offices. Gulf employees did not perform their duties in D & C's offices; D & C employees did not perform their duties in Gulf's offices.

Cormier's primary duties as a fuel dispatcher were, *inter alia*, to operate the fuel dock, to receive incoming shipments of fuel, to disburse fuel as needed, to gauge fuel tanks on vessels, and to document all such transactions. Half of Cormier's time was spent on the fuel dock and the other half was spent working in the D & C office filing papers and answering the telephone. He also performed roustabout work when needed. Cormier's work at the fueling dock was not immediately supervised; however, he was generally supervised in his work by Merlin Leonard or Rory Griffin, both D & C employees. At the end of the day, Cormier turned in his paperwork to Leonard. Approximately every two

---

1. During trial, the Court granted the motion of Charles O'Quin d/b/a CAT Welding Services to dismiss the third-party complaint of Gulf.

months, Leonard would rate the D & C employees' performance.

Jacob Meyer, an employee of Gulf, was the overall Shorebase supervisor. Occasionally, Cormier would take orders from Meyer. In addition, at the end of each month, Cormier turned in his fuel reports to Meyer, who completed the paperwork. Cormier had no other regular dealings with Meyer. Cormier considered Leonard his boss and Meyer the "big boss". As Cormier explained the situation, he wanted to do a good job and please everyone; therefore, if Meyer or anyone else gave him an order, he would follow it, but he put Leonard first because D & C was his employer.

Cormier did not take any tools with him to work. Gulf furnished any necessary tools and equipment and the place of performance. He wore a hard hat and steel toed shoes which D & C required him to purchase when he was hired. Cormier did not wear a uniform, but those D & C employees who did, wore uniforms with the D & C logo.

Leonard kept track of the D & C employees' time. D & C paid Cormier his wages and provided medical, hospitalization and other insurance. Cormier did not have to consult with Gulf regarding vacation time.

About once a week an operations man from D & C would visit the Shorebase to check on the employees' and the customer's needs. D & C also conducted safety meetings at the Shorebase for its employees and gave its employees, including Cormier, safety awards when merited.

Gulf had nothing to do with the hiring of D & C employees. When a D & C employee is first hired, the personnel department tells the employee when and where to report to work. Thereafter, the D & C supervisor at the job site instructs the employee as to his work schedule. Gulf had no power to fire a D & C employee. If Gulf told D & C that an employee was not satisfactory, D & C would either transfer the employee to another job or fire him.

Occasionally, a D & C employee left D & C to become a Gulf employee. That employee's relationship with the D & C employees did not change; however, D & C would discontinue insurance coverage and take them off the payroll.

In determining whether a borrowed servant relationship existed, this Court referred to the multi-factored test set forth in *Ruiz v. Shell Oil Co*, 413 F.2d 310 (5th Cir.1969). In applying the *Ruiz* factors, the Court found as follows:

(1) Who had control over Cormier and the work he was performing beyond mere suggestion of details or cooperation? Day to day, immediate control over Cormier's activities was exercised by D & C through its dispatch supervisor, Leonard. Gulf did not exercise any supervision over Cormier, other than his monthly fuel reports and occasional orders from Meyer. Any control Gulf exercised over Cormier was incidental to D & C's control.

(2) Whose work is being performed? The D & C employees worked to advance Gulf's oil exploration and production business.

(3) Was there an agreement between the original and borrowing employer? D & C and Gulf entered into a written contract "to furnish general oilfield labor, equipment, and boats, inshore and offshore ... to be performed ... as requested by ... Gulf." Section 6 of the contract specifies that D & C is an independent contractor, "with the authority to control and direct the performance of the details of the work, Gulf being interested only in the results obtained" and shall "be subject to the general right of inspection herein provided to Gulf to secure the satisfactory completion thereof." Other provisions require D & C to provide certain insurance coverage, and Section 11 states that in the event of conflict between this contract and any other agreement, whether written or oral, that this contract's provisions shall control.

The Court recognized that the contract provision naming D & C as an independent contractor is not controlling, but that the way the parties' carried out the contract must also be considered. *See Alexander v. Chevron*, 806 F.2d 526, 527 (5th Cir.1986). This Court found that the manner in which Gulf and D & C carried out the subject

contract was in conformity with the written terms of same.

(4) Did the employee acquiesce in the new work situation? This factor does not apply to the instant situation as Cormier began his job and ended it as a contract employee of D & C, without any change in his status.

(5) Did the original employer terminate his relationship with the employee? D & C did not terminate its relationship with Cormier. D & C maintained contact with and control over its employees. D & C paid Cormier, transported him to and from work, regularly conducted safety meetings, and supplied a foreman who had supervisory control over Cormier, as well as an office representative who checked on the employees weekly.

(6) Who furnished tools and place of performance? Gulf owned the premises at the Shorebase and thus, furnished the place of performance. Cormier purchased his own hard hat, work clothes and steel toed shoes. Gulf furnished any necessary tools and equipment.

(7) Was the new employment over a considerable length of time? Cormier's employment with Gulf was not "new employment," but it was his most recent employment. Cormier's work at Gulf was over a continuous five year period.

(8) Who had the right to discharge an employee? D & C had the right to discharge an employee. If Gulf were dissatisfied with an employee, it could ask that the person be replaced; D & C would honor such a request, its main concern being to satisfy its customers. However, it was D & C's sole decision to terminate the employee or assign him to a new job.

(9) Who had the obligation to pay the employee? The contract between D & C and Gulf states at Section 5 that "Contractor shall at contractor's expense furnish foreman, labor ... necessary for the performance of the work...." Leonard, the D & C supervisor, kept track of Cormier's time. D & C paid Cormier's wages.

This Court finds that the facts in *Benoit v. Transco Exploration Co.,* 577 F.Supp. 304 (W.D.La.1983), *aff'd,* 739 F.2d 631 (5th Cir.1984), closely resemble those in the instant case. In *Benoit,* the plaintiff was a roustabout employed by Crain Brothers. Plaintiff was injured while loading supplies to be transported to offshore rigs owned and operated by Transco Exploration. The jury found that the plaintiff was not the borrowed employee of Transco. In response to a motion for judgment n.o.v. and/or new trial, the Court reviewed the facts, applied the *Ruiz* factors, and concluded that the jury's verdict was supported by the evidence. The Court noted the following facts, which cannot be distinguished from the case at bar:

> In reaching this conclusion we note (a) plaintiff was paid by Crane; (b) he was under the supervision of a foreman, who was also paid by Crain; (c) Crain furnished transportation to and from the jobsite; (d) the contract between Crain and Transco left the "details, manner and method of performing the work to Crain."

*Id.* at 309.

It is strongly urged that application of *Capps v. Baroid–NL Industries, Inc.,* 784 F.2d 615 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 141, 93 L.Ed.2d 83, to the case at bar would result in finding that the plaintiff was a "borrowed employee" of Gulf and hence only compensation benefits are due. In the *Capps* case, summary judgment had been rendered in favor of Baroid finding that Capps was Baroid's borrowed employee. Davis & Sons, a labor supply company, hired Capps and on his first day he was assigned to a Chevron facility; on the second day he was assigned to a Shell facility and on the third day he was assigned to Baroid. Capps was placed under the direct supervision of a Baroid employee, to clean the plant, in the course of which the accident occurred.

*Capps* is distinguishable from the case at bar in the following respects: Davis gave Capps no instructions as to the work he would perform at Baroid; there was no written contract between Davis and Baroid establishing an independent contractor relationship; and Davis had temporarily ter-

minated its relationship with Capps in that Davis exercised no control over Capps while he worked at Baroid and placed no restrictions on Baroid with respect to Capps' employment conditions. The Court notes that the *Capps* ruling was on summary judgment and not after trial.

■ Accordingly, the Court declines to apply *Capps* as controlling in the case at bar. The totality of the circumstances, the *Ruiz* factors, and the analogous facts in *Benoit*, compel the conclusion that Cormier was not a borrowed servant of Gulf and therefore, Cormier's remedy is not limited to the Longshoremen's and Harbor Workers' Compensation Act.

The Court next considers Cormier's allegations of negligence and strict liability against Gulf. Cormier was injured when he tripped on an angle iron protruding from a section of grating on the fuel dock. The grating had been installed approximately nine months prior to the accident by Charles O'Quin d/b/a CAT Welding Services at the request of Jacob Meyers, the Gulf supervisor. Thirteen sections of grating were installed over a drainage pan designed to catch fuel which might spill during the fueling of vessels. Each of the thirteen sections of grating were held in place over the drainage pan by an "L" shaped piece of iron (angle iron) which protruded over one inch above the surface of the grating. In order to perform his duties as a fuel dispatcher, Cormier had to walk on the grating. When Cormier first saw the grating, he told Meyer that the angle irons created a dangerous situation. Cormier also asked O'Quin whether he was going to change the angle irons. In addition, Nolan Boudreaux, the yard foreman, told O'Quin that the angle irons should not be sticking up. O'Quin wanted to turn the angle irons down, but Meyer would not allow him to change them.

Donald Makofsky, a structural engineer, testified that there was no structural pur-

pose for the angle irons to protrude above the grating surface. In fact, the protruding portion of the angle iron could have been eliminated entirely because it does not bear any load.

■ At the conclusion of trial, the Court found that Gulf was negligent in designing and constructing the angle irons to protrude above the surface of the grating. Gulf was aware of the dangerous situation the angle irons created and took no steps to alleviate it. Having reviewed the evidence, the Court further finds that Gulf is liable under LSA–C.C. Article 2317.[2] To recover under Article 2317, a plaintiff must show the following: (1) that the thing which caused the injury was in the care or custody of the defendant/owner; (2) that a vice or defect existed in the thing; and (3) that the vice or defect caused the injury. *Sumner v. Foremost Insurance Co.*, 417 So.2d 1327 (La.App. 3d Cir.1982). A vice or defect is defined as a condition of a thing which creates an unreasonable risk of injury to another. *Id.* at 1333. Gulf, admittedly, is the owner of the premises where Cormier was injured. Gulf was responsible for the construction and design of the drainage pan and grating. The vertical protrusions of the angle irons served no purpose and created an unreasonable risk of injury to anyone walking on the grating. In fact, other workers testified that they had tripped on the angle irons. There is no question that a protruding angle iron caused Cormier to fall. It would not have been an unreasonable burden for Gulf to remove the protruding portions of the angle irons. Accordingly, Gulf is liable under Article 2317.

■ Article 2322 is inapplicable to the case at bar because Cormier's injuries were not occasioned by any "ruin", a prerequisite to recovery under Article 2322, meaning the fall or collapse of a substantial component of a building. *See Mott v. Ode-*

---

**2.** Even though the Court has found negligence, the Court must address the strict liability allegations in view of the possible impact on the Court's finding that Cormier was forty percent at fault.

Art. 2317 provides:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable; or of the things which we have in our custody. This however, is to be understood with the following modifications.

co, 577 F.2d 273, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979).

■ At the time of the accident, Cormier was walking backwards, pulling the nozzle of the fuel hose back to the reel on which it was to be wound. Sometimes Cormier would use a crank on the reel to pull in the hose; however, if the hose had been ex-tended some distance, he would first pull the nozzle of the hose to the reel before winding it. Cormier found that this proce-dure lessened the weight of the hose and made it easier to use the crank. He also found that pulling the hose toward himself while walking backward, was easier than dragging the hose while walking forward. Cormier was well aware of the protruding angle irons and the accident was partly caused by his decision to walk backward with the hose and failing to look where he was walking.

Cormier urges that *Bell v. Jet Wheel Blast,* 462 So.2d 166 (La.1985), precludes this Court from reducing his recovery be-cause of his fault. At page 171 of that opinion, it is stated that "comparative fault may be applied in certain categories of cases to reduce the plaintiff's recovery," and at page 172, "the principles of Article 2322 and its predecessors should be applied by analogy so that the claim for damages recoverable shall be reduced in proportion to the degree of negligence attributable to the person suffering the injury, death or loss." The question is whether assessing comparative fault will "serve realistically to promote careful product use or where it drastically reduces the manufacturer's in-centive to make a safer product." *Id.* at 172. Various Louisiana courts have ap-plied *Bell,* a strict products liability case, by analogy to find comparative fault in Article 2317 cases. *Harper v. State Farm Mutual Automobile Ins. Co.,* 484 So.2d 737, 739 (La.App. 1st Cir.1986); *LaJaunie v. Metropolitan Property & Liability In-surance Company,* 481 So.2d 1357, 1364 (La.App. 1st Cir.1985); *Hayes v. Depart-ment of Transportation & Development,* 467 So.2d 604, 608 (La.App. 3d Cir.1985); *Holmes v. Department of Highways,* 466

So.2d 811, 824 (La.App. 3d Cir.1985); *Var-nado v. Sanders,* 477 So.2d 1205, 1217 (La. App. 1st Cir.1985). To determine whether to apply comparative fault in a case involv-ing an employee, Louisiana courts have formulated the the following criteria:

(1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is volun-tary on his part; (4) alternatives avail-able to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger.

*Haas v. Atlantic Richfield,* 799 F.2d 1011, 1015–1016 (5th Cir.1986) (quoting *Miller v. Employers Mutual Liability Insurance Co.,* 349 So.2d 1353, 1362 (La.App. 2d Cir. 1977).

In the case at bar, the condition of the fuel dock was obvious and known to Cormi-er. He was not instructed to carry the hose in an unsafe manner. In fact, he had been instructed to be careful and watch where he was walking. It was Cormier's independent decision to pull the hose while walking backward. He could have chosen to walk forward with the hose and, if he were not physically able to drag the hose in that manner, could have asked for help. Although walking forward would not en-tirely eliminate the risk of falling on the angle irons, it would have been the safest manner for Cormier to carry out his duties. Accordingly, Cormier's recovery may be re-duced by his fault in the amount of forty percent.

Cormier underwent back surgery on Jan-uary 17, 1985 and neck surgery on Septem-ber 25, 1985. He has not returned to work. The medical evidence indicated that Cormi-er has a fifteen percent anatomical disabili-ty and that he can work within certain physical restrictions such as not lifting over forty pounds, not operating heavy or vibrating equipment, and not sitting, stand-ing or walking for prolonged periods of time. The unconflicting medical testimony was that returning to work under the out-lined restrictions would be beneficial to Cormier.

Twenty-five months elapsed between the date of the accident (September 28, 1984) and the date of trial (October 27, 1986). Cormier's average annual income for the 1980–1984 period was $22,774.00 or $1,897.83 per month, or a total loss of past wages of $47,445.15. As to future wages, Cormier has a work life expectancy of about eighteen years, which when multiplied by his annual wages, amounts to a total loss of future wages of $409,932.00. The Court will not subtract anything for depressed conditions in the oil industry, nor add anything for future promotions or inflation, as these two figures should balance out. The evidence shows that Cormier should be able to earn $4.50 per hour or $180 per week or $9,000.00 per year on a job he could expect to obtain in another type of work. Multiplying this by eighteen years amounts to $162,000.00, which when offset from the $400,932.00 loss, equals a net loss of $247,932.00. Applying a two percent below market discount factor for the eighteen year period, the net loss will be $158,676.48.

■ Cormier sustained serious injuries to his neck and low back. His accident has had a profound negative effect on all aspects of his life. Accordingly, the Court finds damages for pain and suffering in the amount of $100,000.00.

The Court finds no evidence of future medical expenses. Past medical expenses were stipulated to be $18,781.19. Thus, the total damages are $324,903.42 and the net damages after deducting forty percent for plaintiff's fault are $194,942.05.

■ The Court next considers the intervention of D & C for reimbursement of benefits paid to Cormier under the Longshoremen's and Harbor Worker's Compensation Act. On September 28, 1984, D & C was Cormier's employer. As a result of Cormier's injury on that date, D & C has paid him compensation through December 19, 1986 in the amount of $32,413.90. In addition, D & C made medical payments in the amount of $18,781.19. Both of these amounts were stipulated to and evidenced by D & C at trial. Pursuant to the Longshoremen's and Harbor Worker's Compen-

sation Act, D & C is entitled to be reimbursed for past compensation and medical expenses from the net proceeds of any third-party recovery. *Peters v. North River Insurance Company,* 764 F.2d 306 (5th Cir.1985).

Finally, the Court considers Gulf's claim that it is entitled to indemnity from D & C. This issue came before the Court on a motion for summary judgment prior to trial. The Court granted D & C's motion for summary judgment on the issues of tort indemnity, breach of implied warranty of workmanlike performance, and the indemnity owed by Gray & Company. The Court reserved ruling on the issue of contractual indemnity until the Fifth Circuit Court of Appeals renders a decision in *Meloy v. Conoco, Inc.,* 794 F.2d 992 (1986). The Louisiana Supreme Court accepted certification of the indemnity issues involved in *Meloy* on November 7, 1986. *Meloy v. Conoco, Inc.,* 496 So.2d 340 (La.1986). A ruling has not been issued as of this date. In view of the potential for great delay in awaiting a ruling in *Meloy,* this Court has decided to render a ruling on the indemnity issues involved in the case at bar.

■ D & C urges that Gulf's claim for contractual indemnity is barred by the Louisiana Oilfield Indemnity Act of 1981, La. Rev.Stat.Ann. § 9:2780, which renders certain indemnity agreements null and void as against public policy. The indemnity agreement between Gulf and D & C is found in a "Blanket Contract" dated May 16, 1980. The Act became effective on September 11, 1981, prior to the date of Cormier's injury, but subsequent to the date of the Blanket Contract. Thus, the initial question is whether the 1981 Act applies to a pre–1981 agreement and a post–1981 injury.

The Act provides that its coverage "specifically includes what is commonly referred to in the oil industry as master or general service agreements or blanket contracts in whatever form and by whatever name." The Act also provides that it shall not apply to any indemnity contract where such a contract was (1) executed before the effective date of the Act, *and* (2) the con-

tract governs a specific terminable performance of a specific job or activity. Thus, the indemnity contract between Gulf and D & C must meet both requirements in order to preclude retrospective application of the Act. *See Durant v. Chevron, U.S.A., Inc.,* 594 F.Supp. 527, 535 (E.D.La. 1984). "The clear inference from this statutory distinction [between a blanket contract and a contract for a specific terminable performance], is that the Act will apply to a [blanket] contract, even if executed prior to the effective date of the Act." *Home Insurance Company v. Garber Industries, Inc.,* 588 F.Supp. 1218, 1222 (W.D.La.1984).

"A contract is executed, for the purposes of this Act, when all of the acts necessary to render it a binding obligation are completed." *Page v. Gulf Oil Corporation,* 775 F.2d 1311, 1314 (5th Cir.1985). In the case at bar, D & C worked steadily for Gulf on a daily basis, both before and after the date of the Blanket Contract, until July, 1985 when Gulf merged with Chevron. Although the exact date the agreement became binding is not clear, D & C regularly performed work pursuant to the Blanket Contract prior to September 11, 1981. The parties relationship and course of conduct was established to the extent that this Court concludes that the Blanket Contract was executed and made binding prior to September 11, 1981, thereby meeting the first part of the Act's limited exception to retrospective application.

However, after reviewing the Blanket Contract, it is evident that it did not govern a specific, terminable performance. The Blanket Contract provided for an initial term from May 16, 1980 to May 16, 1982, but it also provided that the contract would continue "as long thereafter as necessity for same continues." The contract further provided that "[t]he jobs to be performed will be as requested by an authorized representative of Gulf and directed to you as 'contractor'." Under the Blanket Contract, a separate, independent contract was perfected on each occasion D & C performed jobs as requested by Gulf. *See Credeur v. Union Oil Company,* 618 F.Supp. 782 (W.D.La.1985) (*Moser v. Aminoil, U.S.A.,*

*Inc.,* 618 F.Supp. 774.) *Home Insurance Company v. Garber Industries, Inc.,* 588 F.Supp. at 1222, n. 6. Since the Blanket Contract is not limited to a specific terminable performance, the second part of the Act's limited exception to retrospective application is not met. Therefore, the Blanket Contract is governed by Section 2780.

█ Section 2780 provides that agreements between parties to contracts affecting the energy industry are absolutely void when they provide for indemnity against the indemnitee's sole or concurrent negligence or strict liability. Thus, the agreement that D & C defend and indemnify Gulf for Gulf's negligence and/or strict liability is null and void as against public policy per Section 2780.

Accordingly,

(1) IT IS ORDERED that judgment be entered in favor of plaintiff, Sam J. Cormier, and against defendant, Gulf Oil Corporation, in the amount of $194,942.05.

(2) IT IS FURTHER ORDERED that judgment be entered in favor of Danos & Curole Marine Contractors, Inc. and against the third party recovery of Sam J. Cormier against Gulf in the amount of $51,-195.09;

(3) IT IS FURTHER ORDERED that judgment be entered in favor of third-party defendants, Danos & Curole Marine Contractors, Inc., U.S. Fire Insurance Company, North River Insurance Company, and International Surplus Lines Insurance Company and against third-party plaintiff, Gulf Oil Corporation, dismissing Gulf's third-party complaint, each party to bear its own costs.